UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

UNITED STATES OF AMERICA,

vs.

CLAYTON BROTHERS

                Defendant.

-----------------------------------------------------------x

Case No. 15 Cr. 198 (BKS)

## DEFENDANT'S POST-SUPPRESSION HEARING SUBMISSIONS

The Defendant, Clayton Brothers, respectfully files this post-hearing brief in support of his motion to suppress. This brief of law should be read in conjunction with Mr. Brothers' pre-hearing brief which was filed on October 29th, 2015 (CM/ECF No. 19), portions of which have been inserted herein.

It must be noted at the very outset that the Government chose not to call HSI Agents Timothy Losito or Jason Young, Investigator Nye from the New York State Police, Parole Officer Tousignant, or Jamie Brothers, the Defendant's wife. The Government called Parole Officer Christopher Lawrence, and HSI Agent Christopher Revord. Revord had no first-hand knowledge of the events which transpired at the home (though he did interview Brothers at the prison). The Government's decision not to call Agents Losito and Young is peculiar, particularly in circumstances where the Government bears the burden of proving that the search was lawful. Additionally, where was Jamie Brothers who supposedly consented to the search? And where was John Parker? Why didn't the Government call them to testify?

## FACTUAL BACKGROUND

### *Christopher Lawrence*

Christopher Lawrence was the first witness to testify. He was Clayton Brothers' parole officer in New York (Tr. 4). He tacitly admitted that HSI agents lead the search. When asked, "[a]fter the search of the computer was negative, what, if anything, did you do?", he replied that "[HSI agents' had looked around a little bit, little bit more." (Tr. 14) He admitted that he did not personally "go through and search the house". (Tr. 14). He also admitted that the evidence which John Parker allegedly discovered, was found in Brothers' bedroom, and in Brothers' garage (Tr. 17). Parker was not residing at 861 Blanchard, the residence where the firearms were recovered when he first conducted an inspection of the property prior to allowing Brothers to reside there (Tr. 27-28).

Lawrence attended Brothers' residence in response to a call from Investigator Nye, from the New York State Police, on April 24th, 2014, regarding a sex abuse investigation (Tr. 31). Upon arriving at Brothers' residence on April 24th, 2014, Lawrence "found out that Clayton Brothers had left the house the day before". (Tr. 32) Later that day Lawrence learned that Brothers' credit card was used as far away as Virginia. (Tr. 33) He admitted that neither he, nor HSI agents, obtained a search warrant to search Brothers' residence or computer, notwithstanding the fact that Brothers' was in Virginia at the time of the search (Tr. 36). He also admitted that he had no reason to believe that Brothers would be in the residence, on April 28th, 2014 - he was correct (Tr. 36). He testified that Jamie Brothers had told him that Brothers had left the house on his motorcycle several days before (Tr. 32).

Lawrence testified that at the time he went to the house, on April 28th, 2014, he had no information about Brothers possessing any weapons (Tr. 42). He further stated that Homeland Security agents were the ones that examined his computer, not Lawrence directly. Lawrence had no involvement in searching the computer (Tr. 45). Parker was the only one at the Brothers' residence when he went to the residence on April 29th, 2014 (Tr. 49). Lawrence went to the residence in response to a telephone call which he received the night before indicating that Parker had found some firearms (Tr. 50). He testified that Parker may have only arrived at the residence at the end of February 2014, a mere two months prior to the time the guns were discovered (Tr. 51). He did not know whether Parker had a key to the house, he did not know whether Parker paid rent, and he did not know whether Parker received mail at the residence (Tr. 51). Lawrence admitted that none of the guns were in plain view, and that they were only found because Parker searched the residence (Tr. 14). He admitted that Parker was the only one who had knowledge of the weapons, and that neither Jamie Brothers, nor Robyn Hicks, nor Lauren Hicks, had any knowledge of the weapons (Tr. 55). Lawrence admitted that Parker was only "going to be staying [at the Brothers' residence] for a little bit", and agreed with defense counsel that it was not supposed to be a permanent thing - it was only temporary (Tr. 67-68).

### *Christopher Revord*

Christopher Revord was the second witness to testify. Revord is an HSI agent. The case was referred to him by Investigator Nye in April 2015 (Tr. 70). Parker did not arrive at the Brothers' residence until February 2014 (Tr. 73).

On May 12th, 2015, Revord and another agent interviewed Brothers at the Camp Hill Correctional Institute, where Brothers was incarcerated for his parole violation (Tr. 77-

78). Brothers was interviewed in a small room, which was approximately 8 by 10. (Tr. 79) The door to the interview room was closed during the interview (Tr. 80). Revord and one other agent showed Brothers photos of weapons that were seized from 861 Blanchard Hill, along with several invoices from cheaperthandirt.com (Tr. 81). Brothers was never read his Miranda rights (Tr. 82). Brothers requested an attorney and Revord stated that he could not provide Brothers with an attorney.  (Tr. 82). As the agents were packing up to leave, Revord showed Brothers an invoice of "a specific attachment to a weapon that [Brothers] had purchased under his name and shipped to himself" and which was "attached to a weapon found at his property." (Tr. 82-82) After the interview was terminated, Revord "made contact with one of the corrections officers and they led [Brothers] somewhere else in the facility." (Tr. 84)

Revord admitted that "both Jamie and Robyn said Clayton made it well known to the family that they should not go through his belongings and to stay away from his property." (Tr. 86). Revord admitted that Brothers owned the property and that Parker did not arrive at the property until the end of February 2014 (Tr.73). Brothers left "immediately after the school had informed Jamie Brothers of the sexual assault", well before  HSI agents went to 861 Blanchard on April 28th, 2014 (Tr. 88). He indicated that HSI agents in specific "told the family to look for anything suspicious" (Tr. 92). Revord did not know whether Parker was part of the family, had no  idea how long Parker had been staying at the house, had no idea whether anyone spoke to Parker about which bedroom he slept in, had no idea whether anyone spoke to Parker about what items in the residence were his, had no idea whether anyone asked Parker if he paid rent, had no idea whether anyone spoke to  Parker about whether he had keys to the house, or whether he received mail at the house (Tr. 92-

93).

Parker came as a boyfriend's of Robyn's, one of Brothers' daughters (Tr. 93). He admitted that Parker is the one who called the police, and that no one from law enforcement obtained a search warrant even though Brothers was not present (Tr. 93-94). Revord admitted that Jamie Brothers was not present when the weapons were found, nor were Robyn Hicks or Lauren Hicks (Tr. 95). Parker was the only one present when law enforcement came to the house (Tr. 95). Revord admitted, when confronted with the grand jury transcript that "John Parker conducted a search of the home at the behest of the agents who were searching the computers." (Tr. 96) Revord admitted that Parker searched the house because the police asked him to look for suspicious things (Tr. 96). He also admitted that Parker was the one who provided agents with all of the information pertaining to the weapons (Tr. 99).

Revord admitted that at no time did agents ever apply for a search warrant before going on Brothers' property (Tr. 105). Revord asked for a private room at the jail, in which to interview Brothers (Tr. 113). There was a desk with a correctional officer sitting less than 10 yards away from the room (Tr. 114). In order to see Revord, Brothers had to be escorted to a central hub by a correctional officer, at which time Revord and another agent brought him into the private room. (Tr. 114). The agents advised Brothers that guns were found at the house and that they were seeking to indict him (Tr. 118). They told Brothers they were giving him the opportunity to straighten the situation out (Tr. 118). They showed Brothers six to eight pictures, including pictures of the guns, body armor, ammunition, as well as the cheaperthandirt receipts (Tr. 118). Revord stated that Brothers "uttered, they are not all mine" without having been read his Miranda warnings (Tr. 120). Brothers asked

for a lawyer, and he was told that Revord could not get him a lawyer (Tr. 121). After Brothers invoked his right to counsel, Revord showed him pictures of the evidence recovered, as well as the fact that the optic sight on one of the weapons was catalogued as an item he purchased from cheaperthandirt (Tr. 122). Rather than asking Brothers whether he wished to waive his rights, the agents engaged in discourse with Brothers (Tr. 122-123). Once the interview finished, Brothers was turned over to a corrections officer. (Tr. 123).

### *Robyn Hicks*

The third witness to testify was Robyn Hicks. She testified on behalf of the Defense. Hicks testified that Parker was her boyfriend and that he came to New York at the end of February 2014 (Tr. 126). He arrived with just a backpack. (Tr. 127) He was never provided keys to the house. He did not pay rent. He did not have his own room (Tr. 127). Hicks admitted that Brothers "always made it clear to [her] that he didn't want [her] or any other member of the family to touch his stuff." (Tr. 127) She stated that the computer was password protected, and that she did not know the password (Tr. 127-128). She had no knowledge of the guns in the house, nor did she have any knowledge of the ammunition (Tr. 127-128). She testified that neither she, nor her mother, nor her sister, were home when law enforcement came to the house and met with Parker on April 29, 2014 (Tr. 92-128).

On cross-examination Hicks testified that she and John came to live at 861 Blanchard Hill after getting to New York on an airplane. Brothers paid for the tickets (Tr. 128-129). She explained on cross-examination that "there was really no plan" for her and Parker to "stay there" (Tr. 129). Hicks testified that Parker would help "with groceries"

sometimes, and that he would "help take care of the property." (Tr. 130). She testified that Parker eventually got a job at Pizza Hut, but even then he did not contribute to household expenses (Tr. 130-131).

On re-direct Hicks testified that her parents had never met Parker before, that Parker did not get a job until after the guns were found, and that she remembered "Clayton telling John that he could stay but he had no interest in the property he could stay there until he got on his feet." (Tr. 131-132).

## ARGUMENT

**The Burden of Proof is on the Government**

This case involves a warrantless search. "A warrantless search is 'per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-detailed exceptions.'" United States v. Kiyuyung, 171 F.3d 78, 83 (2d Cir. 1999) (quoting Mincey v. Arizona, 437 U.S. 385, 390 (1978)). "If the defendant succeeds in showing that the officers conducted a warrantless search, the burden shifts... to the government to show that the search fell within one of the exceptions to the warrant requirement." United States v. Gagnon, 230 F. Supp. 2d 260, 267-68 (N.D.N.Y. 2002).

**John Parker was acting as an agent of police and without consent and the evidence should be suppressed**

It is uncontroverted that Parker found the firearms in question. It is also clear that Parker was acting at the behest of government agents. Revord admitted, once confronted with the grand jury transcript, that "John Parker conducted a search of the home at the behest of the agents who were searching the computers." (Tr. 96) He also testified that

"[w]hen law enforcement spoke to John Parker, he specifically called the agents because they asked him if he could locate anything suspicious in the house" (Tr. 48).

It is important to note at the outset of this discussion, that the warrantless search conducted by Parker would, if it had been conducted by law enforcement agents, have been a blatant violation of the Fourth Amendment. And, even if agents did not explicitly demand that Parker search the house, it is well established that the government may become a party to a search through nothing more than tacit approval. Lustig v. United States, 338 U.S. 74, 78-79 (1949); United States v. Knoll, 116 F.3d 1313, 1320 (2d Cir. 1994); 1 Wayne R. LaFave, Search & Seizure § 1.8(b).

The searches that Brothers challenges were performed by Parker, a private party, rather than directly by government agents. Private parties are bound by the requirements of the Fourth Amendment when they "operate as de facto state actors." United States v. DiTomasso, 81 F. Supp. 3d 304, 308 (S.D.N.Y. 2015). Private parties may be considered de facto state actors under a number of different circumstances. One such circumstance is when a private party performs a search "with an intent to assist law enforcement." In order to determine whether a private individual intended to assist law enforcement, courts in this circuit look to: (1) "whether the defendant has demonstrated government knowledge and acquiescence in the search;" and (2) "whether the private searcher intended to assist law enforcement as opposed simply to achieve his own ends." United States v. Longo, 70 F. Supp. 2d 225, 259 (W.D.N.Y. 1999) (citing United States v. Bennett, 709 F.2d 803, 805 (2d Cir. 1983) and United States v. Feffer, 831 F.2d 734, 737 (7th Cir. 1987)). Here, the Government had knowledge of the search, the Government acquiesced in the search, and Parker clearly intended to assist law enforcement.

Based on the evidenced adduced at the hearing, Parker did not have common authority to Brothers' home, a substantial interest in the home, or permission to gain access to Brothers' bedroom or the garage. Lawrence admitted that Parker had only arrived at the residence at the end of February 2014, a mere two months prior to the time the guns were discovered (Tr. 51). He did not know whether Parker had a key to the house, he did not know whether Parker paid rent, and he did not know whether Parker received mail at the residence (Tr. 51). Similarly, Revord did not know whether Parker was part of the family, had no idea how long Parker had been staying at the house, had no idea whether anyone spoke to Parker about which bedroom he slept in, had no idea whether anyone spoke to Parker about what items in the residence were his, had no idea whether anyone asked Parker if he paid rent, had no idea whether anyone spoke to Parker about whether he had keys to the house, or whether Parker received mail at the house (Tr. 92-93). Hicks testified that Parker arrived with just a backpack. He was never provided keys to the house. He did not pay rent. He did not have his own room (Tr. 127).

Even though the physical act of searching was done by Parker, a private person, the search was still governmental action because it was instigated by the authorities. Parker was prodded by the authorities and acted at the behest of agents. Thus, the Fourth Amendment is applicable, and the fruits of the search must be suppressed. This assertion is supported by the case law. For example, the Fourth Amendment was held to apply when a police officer asked a landlord to enter his tenant's apartment to see if the tenant was there. United States v. Hardin, 539 F.3d 404 (6th Cir.2008) ("the officers urged the apartment manager to investigate and enter the apartment"); and where a customs agent asked an airline transportation agent to open a package placed with the airline for

shipment. Corngold v. United States, 367 F.2d 1 (9th Cir.1966).

Parker became the "agent" of the government official, and the fact that he was acting at the behest of law enforcement has a bearing upon the legality of his conduct, for an agent's authority over certain property may be limited by the purposes for which he is acting. For example, where a shipper may have authority pursuant to the contract of carriage to open a package to see that the proper rate was charged, this does not mean that the shipper's employees may lawfully open a package placed with the shipper at the instigation of a customs agent who is seeking evidence of criminal conduct. Corngold v. United States, 367 F.2d 1 (9th Cir.1966). See also United States v. Souza, 223 F.3d 1197 (10th Cir.2000) ("While companies such as UPS have legitimate reasons to search packages independent of any motivation to assist police," here search was governmental, as officers who had witnessed drug dog alert to package twice encouraged UPS clerk to open package).

Even if Parker were properly allowed to enter the garage and the attic, and private areas of the house, the fact that he was acting at the behest of agents in doing so renders the search unlawful. Based on the facts, and on the aforementioned cases, there can be no doubt that the evidence discovered by Parker was contrary to the Fourth Amendment as he was acting at the behest of HSI agents. Additionally, and based on the evidence, Parker did not have the ability to consent to a search as he was simply a temporary guest. Therefore, Parker did not have the authority to consent to the search and the Court should exclude evidence of the items he found. Moreover, there is simply no credible evidence that Jamie Brothers gave consent to search and an adverse inference should be drawn from the Government's failure to call her as a witness.

**The Search in Question Was not a Valid Parole Search**

Brother's asserts that New York State Parole could have violated him on April 24th, 2014, based on the fact that he left New York State without first obtaining permission from his parole officer in direct contravention of his parole conditions (Suppression Hearing Exhibits 1 & 2). As Lawrence was well aware, Brothers had left New York on April 23rd or 24th, and in fact, on April 24th, 2014, he learned that a credit card belonging to Brothers was used in Winchester, Virginia (Tr. 32-33). Given that Brothers' had left the residence on April 24th, 2014, there was sufficient cause to violate him, Brothers argues that the April 28th, 2014, search was not a valid parole search because there were already ample grounds to violate him. It is uncontroverted that Brothers' conditions of parole required that he remain in New York, unless he first obtained permission from his parole officer. Brothers' received no such permission and he was ultimately charged with violating his parole.

Lawrence already had sufficient grounds to violate Brothers, as of April 23rd, 2014, and so any searches which took place after Brothers left his residence on April 23rd, 2014, were unlawful, including the April 28, 2014, search where computer forensic agents from the Department of Homeland Security Investigations unit arrived at Brothers' home to search his computers and electronic media for evidence of child exploitation. The officers who performed the search did not have a warrant. They found no evidence of wrongdoing. And, it was only the following day, on April 29th, 2014, that agents went to retrieve firearms which Parker allegedly found, after Parker was asked to look for anything suspicious (Tr. 48, 51).

Under "general Fourth Amendment approach" to analyzing constitutionality of warrantless search of a parolee or probationer in situation where a governing statute,

Page 12 of 18

regulation, or condition of parole authorizes the search, the reasonableness of the search is determined by assessing, on one hand, the degree to which it intrudes upon the individual's privacy and, on other, the degree to which it is needed for promotion of legitimate governmental interests. U.S.C.A. Const.Amend. 4. United States v. Kone, 591 F. Supp. 2d 593 (S.D. N.Y. 2008).

A probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be reasonable; nevertheless, officers may search a person's home without a warrant based on probable cause when special needs, beyond the normal need for law enforcement, make the warrant and probable cause requirement impracticable. U.S.C.A. Const. Amend. 4. United States v. Vincent, 167 F.3d 428 (8th Cir. 1999).

In United States v. Carnes, 309 F.3d 950 (6th Cir. 2002), the Court held that a search warrant and probable cause were required, following a parolee's arrest at girlfriend's house for suspected parole violations including violation of residency requirement. The Court held that the parole agreement did not expressly allow police greater authority to search parolee, but rather permitted search for greater number of things, such as evidence of not living with his sister as required by parole agreement. Additionally, the Court held that state parole regulation only spoke to warrantless searches for evidence of parole violation or facially incriminating evidence in plain view.

It is important to note that Lawrence was not being assisted by HSI agents. Rather, HSI agents took the lead in the investigation- and Lawrence personally took no part in the search of the computers (Tr. 45). Lawrence's involvement in the search as a whole can only be characterized as extremely limited (Tr. 45). It is generally held that where police or

other peace officers are "assisting" rather than directing a parole officer in conducting a warrantless search of a parolee or his property, the mere assistance of such peace officers does not affect the validity of the search. United States ex rel. Santos v New York State Board of Parole, 441 F2d 1216 (2d Cir. 1971); United States ex rel. Randazzo v Follette, 282 F Supp 10 (DCNY 1968), affd 418 F2d 1319 (2d Cir. 1969). In the case at bar, however, it is clear that HSI agents took the lead and that Lawrence's involvement was minimal (Tr. 45, 46, 47).

The case at bar is not dissimilar from United States v Hallman, 365 F2d 289 (3rd Cir. 1966). In that case a state parolee was taken into custody without probable cause by a state police officer and an FBI agent. He was transported to the office of the parole officer, where he admitted to the parole officer that he had violated a condition of his parole. At the demand of the parole officer who, the court said, was acting at the request of the police officer and the FBI agent, the parolee exhibited the money he was carrying, which turned out to be money taken in a bank robbery. The Court held that the parole officer was nothing more than an "agent, tool, or device" of the police, and that the parolee had been subjected to an unreasonable search and seizure in violation of the Fourth Amendment. After being informed by the police officer that the parolee was likely in violation of his parole, the parole officer had requested the police officer either to send the parolee to his office or to bring him to the office. The court concluded that the state police officer had arrested the parolee without probable cause and that this condition of custody had continued throughout the interview with the parole officer. The parole officer did not issue a warrant for the parolee's arrest until after the police officer had identified the money as being part of the money taken in a bank robbery. The parolee was later tried and convicted

on bank robbery charges on the basis of the money obtained in the search. On appeal the judgment was set aside, the court explaining that the parole officer could not direct a police officer to bring the parolee to his office without issuing a warrant and that nothing in the record indicated an existing emergency or facts which would justify the conclusion that time was of the essence. The state police officer and the FBI agent suspected the parolee as being involved in the bank robbery and had acted in pursuance of this suspicion. The court said that notwithstanding that it was the parole officer who requested the parolee to produce the money from his pockets, the act was the further act of the police officer and the FBI agent, at whose insistence it was performed, and to whom the money was turned over forthwith for examination and comparison with lists those officers had with them. The veil afforded by the parole officer's position could not, in the present situation, serve as a shield against what was plainly the action of the arresting officers to effect an illegal search. Here too, Lawrence's presence does not legitimize a blatantly illegal search.

On a related note, the search of Brothers' house was not a valid parole search because they agents searched all of the devices which Brothers had access too, rather than just searching his devices, as agreed by the New York & Pennsylvania Consent forms (Page 3 of Revord's Report).

**Brothers' Statement Should be Suppressed**

The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself." It thus bars the use of any statements at trial that were made by a criminal defendant involuntarily. United States v. Patane, 542 U.S. 630, 640 (2004). A statement is "involuntary" if it was obtained by any type of physical or psychological coercion, or by some improper inducement that resulted in a defendant's will

being overborne. Haynes v. State of Washington, 373 U.S. 503, 513-14 (1963); Lynumn v. Illinois, 372 U.S. 528, 534 (1963).

The Government has the burden of establishing that any statements made in custody are voluntary, and that the individual knowingly and willingly waived his Miranda rights. See 18 U.S.C. § 3501(a) (requiring that the government establish the voluntariness of any confession before it is admitted against the defendant in a criminal trial.) See also, Colorado v. Connelly, 479 U.S. 157, 164, 168-69 (1986); United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995). To determine voluntariness, courts consider the "totality of all the surrounding circumstances, including the [defendant's] characteristics, the conditions of interrogation, and the conduct of law enforcement." United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991); Parsad v. Greiner, 337 F.3d 175, 183 (2d Cir. 2003). As with consent, relevant characteristics include a defendant's age, his mental capabilities, his familiarity with the criminal justice system, and any coercive or threatening actions by law enforcement. United States v. Egipciaco, 389 F. Supp. 2d 520, 524 (S.D.N.Y. 2005); United States v. Zerbo, 1999 WL 804129 at *8 (S.D.N.Y. 1999).

Miranda v. Arizona, 384 U.S. 436 (1966) requires the police to inform a defendant, prior to questioning, that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Id. 478-79. Miranda rights are triggered when a defendant is subjected to "custodial interrogation." Illinois v. Perkins, 496 U.S. 292, 296 (1990). The warnings are not required where "[t]he essential ingredients of a 'police dominated atmosphere' and compulsion are not present." Id. 296.

In determining whether a defendant is in custody for Miranda purposes, "the ultimate inquiry is simply whether there [was] a... restraint on freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983). At issue is "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." Howes v. Fields, 132 S. Ct. 1181, 1189-90 (2012). The "inquiry focuses upon the presence or absence of affirmative indications that the defendant was not free to leave." United States v. Mitchell, 966 F.2d 92, 98 (2d Cir. 1992). The test is an objective one, based upon the perspective of a reasonable person in the suspect's position. Berkemer v. McCarty, 468 U.S. 420, 442 (1984). An interrogation under Miranda includes not only "express questioning" of the defendant, but also its "functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-301 (1980).

The standard for determining the admissibility of statements made by the defendant is whether or not the "words or actions on the part of the police… are reasonably likely to elicit an incriminating response." Id. "A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." Id. at 301-302 (holding that a few off-hand remarks by the officers were not enough for them to reasonably know that defendant would "suddenly be moved to make a self-incriminating response");United States v. McDaniel, No. 03-Cr-550, 2003 U.S. Dist. LEXIS 14865, at *17-19, 2003 WL 22025872 1, 6-7 (S.D.N.Y. Aug. 29, 2003) (finding that officer's statement to defendant, "if there's something you want to tell me, I'm listening," made after officer informed defendant that police were executing a search warrant of defendant's home and that there were "possibly guns and drugs in the apartment" was

reasonably likely to elicit an incriminating response).

It has been held that statements made by officers designed to clarify a "puzzling declaration" or statements "of routine booking nature" for the suspect do not qualify as interrogatory statements. Andersen v. Thieret, 903 F.2d 526, 532 (7th Cir. 1990) (not suppressing defendant's statement to police officer's question of "Who?," which was only intended to clarify defendant's previous statement, "I stabbed her"); Pennsylvania v. Muniz, 496 U.S. 582, 601-602 (1990) (not suppressing defendant's answers to officer's questions because the questions were intended to secure "biographical data necessary to complete booking or pretrial services").

Here, there is no doubt that Brothers was in custody at the time of the interrogation. Agents arrived at Camp Hill Pennsylvania State Correctional Institute, without giving Brothers prior notice (Tr. 112-113). They told Brothers that guns were found on his property, and then showed Brothers photographs of guns and ammunition (Tr. 81). They also showed Brothers receipts that purported to show Brothers as the purchaser of ammunition, optics and accessories for assault style rife from cheaperthandirt.com. (Tr. 119) The agents did not make off-hand remarks, as was the case in Innis. They did not intend to clarify what Brothers said, as in Andersen, because Brothers made no initial statement. They were not asking routine booking questions, as in Muniz. Rather, as in Broadway the agents used the common police practice of displaying photographs, in order strike a conversation that would yield incriminating statements. Because the agents should have known that employing the use of photographs and receipts might very well elicit an incriminating statement and still failed to administer Miranda warnings, any and all statements Brothers made during that interrogation should be suppressed.

## CONCLUSION

For the reasons discussed above, and in Brothers' Memorandum of Law, dated October 29th, 2015 (CM/ECF Doc. 19), the Court should (1) suppress physical evidence obtained from Brothers' home without a warrant in violation of his Fourth Amendment rights; (2) suppress evidence of statements made to law enforcement officials without Miranda warnings in violation of Brothers' Fifth Amendment rights and after his unequivocal request for an attorney; (3) preclude evidence of an investigation into child molestation allegations, (4) preclude evidence of the balance in Brothers' bank accounts, and (5) preclude evidence that Brothers invoked his right to counsel in response to a notice of seizure.

Dated:   New York, New York
         January 25th, 2016

Respectfully submitted,

Merchant Law Group LLP

By: /s/ Daniel DeMaria

Daniel DeMaria, Esq. (Bar # 518452)
535 Fifth Avenue, Fl. 25
New York, New York 10017
Tel: 212-658-1455
Fax: 877-607-5419
ddemaria@nyslitigators.com